## The BORDENTOWN, etc.

*(District Court, S. D. New York.   April 14, 1883.)*

1. MAKING UP A TOW—DUTY.
    It is the duty of those making up a tow to act with that reasonable and ordinary care which a prudent man exercises for the preservation of his own property.
2. SAME — POSITION IN TIER — OLD BOAT SUNK—CONCURRENT NEGLIGENCE—KNOWLEDGE OF OWNER—HALF DAMAGES.
    Where the defendants, before leaving the Kill Von Kull, in March, had taken the libelant's barge from the second tier, knowing she was an old boat, and put her in the head tier, against the libelant's protest, and on coming out into New

York bay a gale suddenly sprang up, about 9 P. M., causing the boats to chafe so as to start the sheer-plank of the libelant's boat, and to take in water faster than she could keep it clear, whereby she sank shortly before reaching the landing at Jersey City, *held*, the defendants were chargeable with negligence in carelessly putting the barge in a position of special danger, when she was unfit to encounter the hazards of the trip at that season in the head tier. *Held, also*, that the libelant, knowing that his boat was old and weak, and more deeply laden than the others, and unfit for the trip in the head tier at that season, should recover but half his damages, not having objected to proceeding on the voyage with his boat in that position. Notwithstanding a previous protest against being removed to the head tier, there was concurrent negligence in both parties. To avoid responsibility the owner, in such case, must give notice of the unfitness of his barge for the trip in the front tier, and refuse consent to proceed except at the risk of the tug.

In Admiralty.

*Benedict, Taft & Benedict*, for libelant.

*Beebe, Wilcox & Hobbs*, for claimants.

BROWN, J. The libel in this case was filed to recover damages for the loss of the canal-boat J. H. Gillingham, with a cargo of 214 tons of coal. She was one of a fleet of 18 boats, in five tiers, in tow of the Bordentown, from New Brunswick to the Stakes, near Jersey City, by way of the Raritan river and Kill Von Kull. She was in the head tier, the second boat from the starboard side. The tow was considerably belated, and passed New Brighton, in leaving the Kills, about half-past 6, on March 27, 1877. On coming out into the bay she encountered an ebb tide, and shortly afterwards a high wind from the north-west, which made the water considerably rough, so as to break over the bows of the head tier, and shortly before arriving at Jersey City the Gillingham sank, bows first, from filling with water.

Without entering into the details of the testimony the conclusions to which I have come are as follows:

(1) The weight of evidence does not show that at the time of passing New Brighton and coming out into the bay there was any such high wind or sign of rough weather as should charge the Bordentown with negligence or carelessness in proceeding on her way, but that the high wind arose suddenly, and increased rapidly some time after she had got out into the bay, being at 9 P. M. 23 miles per hour.

(2) The progress of the Bordentown was slow,—only about one mile an hour; and the evidence does not satisfy me that after the high north-west wind arose there was anything she could have then done better than to keep her course as she did.

(3) The Gillingham was an old boat; not stout nor staunch, but weakened from age, and loaded within 15 to 18 inches of the water's edge,—several inches deeper than the other boats.

(4) Prior to reaching Perth Amboy, she had been in the second tier. Upon some other boats being there left behind she was placed by those having charge of the tow in the head tier, against the protest of the libelant, but without any express notice that he regarded her as unfit to encounter the hazards of a trip across the bay in the head tier, or any objection to going on in that position.

(5) The captain of the Bordentown knew that she was an old and comparatively weak boat.

(6) The immediate cause of her sinking was the chafing of the boats against each other in the rough water, starting and lifting her sheer-plank, causing her to leak and take in water, which came over her bows and on her decks faster than she could be kept clear by her pumps.

(7) No other boat was injured among the 18 in tow of the Bordentown, and none of 12 others that were in tow of the tug Cahill, which followed shortly behind, and arrived at the same station an hour later.

From these principal facts, and others not necessary to be enumerated, I find that the defendants, knowing that she was an old and weak boat and more deeply laden than the others, in transferring the Gillingham from the second to the head tier of boats, did not act with that reasonable and ordinary care which a prudent man exercises for the preservation of his own property, and which they were bound to bestow upon the libelant's boat, and were therefore chargeable with negligence in so doing.

While it is not certain that the Gillingham might not have sunk if allowed to remain in one of the after tiers of the tow, it is not certain that she would have done so; while it is certain that placing her in front exposed her to more hazard and to greater danger; and for their acts in doing so the respondents must be held chargeable with negligence contributing to her loss.

The fact that no other boat was injured out of the 30 that came through the bay in this sudden north-westerly gale, is sufficient evidence that this boat was not fit, either by her age or deep loading, to encounter the ordinary hazards of a trip in March in the front tier. The libelant, as owner, and well acquainted with the route, and present all the time, is chargeable with knowledge of the unfitness of his boat for this exposure. Had he wished to exempt himself from responsibility in case of her loss, he was bound to do something more than merely to protest against the boat being placed in the front tier; for that is what most boats object to, and avoid, if they can do so; he should also have forbidden his boat to be taken along in that position, or given express notice that she was unfit to encounter the hazards of the head tier, and that the defendants would be held answerable for

any loss. Not having objected to proceeding in the tow if his boat was to be put in the front tier, nor given any notice of her weak and unfit condition, he must be deemed to have acquiesced in her subsequent going on, notwithstanding his former protest; and I must, therefore, hold him jointly chargeable with fault. This court has repeatedly held it negligence in both the owner and the tug to proceed on a voyage with a tow known to both to be unfit to encounter the hazards of the trip. *The Murtaugh,* 3 FED. REP. 404; *The Wm. Cox,* Id. 645, and 9 FED. REP. 672; *Connolly* v. *Ross,* 11 FED. REP. 342, 346.

It is an ancient practice of the admiralty to scrutinize closely claims resting on the loss of old or weak vessels. The necessity of preventing abuses of this kind was such that the ancient laws bore with some severity upon vessels that might be sound and staunch. By article 14 of the Laws of Oleron, it was provided that "if a vessel, being moored, lying at anchor, be struck, or grappled with another vessel under sail that is not very well steered, whereby the vessel at anchor is prejudiced, as also wines or merchandise in each of the said ships damnified, in this case the whole damage shall be in common, and be equally divided and appraised half by half, and the master and mariners of the vessel that struck or grappled with the other, shall be bound to swear on the Holy Evangelists that they did it not willingly or willfully. The reason why this judgment was first given, being that an old decayed vessel might not purposely be put in the way of a better; which will the rather be prevented when they know that the damage must be divided." And similarly by article 26 of the Laws of Wisbury, it was provided that—

"If a ship riding at anchor in a harbor is struck by another ship which runs against her, driven by the wind or current, and the ship so struck receives damage, either in her hulk or cargo, the two ships shall jointly stand to the loss; but if the ship that struck against the other might have avoided it, if it was done by the master on purpose, or by his fault, he alone shall make satisfaction. The reason is that some masters, who have old crazy ships, may willingly lie in other ships' way that they may be damnified or sunk, and so have more than they were worth for them. On which account this law provides that the damage shall be divided and paid equally by the two ships, to oblige both to take care and keep clear of such accidents as much as they can." Cited from 1 Pet. Adm. Rep. xxvii, xxviii.

Upon the same principle the owner of a barge, unfit for the trip or for the position assigned her on the tow, must be held required to show show at least that he dissented to proceeding upon the voyage,

in order to absolve him from his share of the responsibility in case of her subsequent loss. Nor can it be suffered that old barges be run until they sink, and the whole loss be then charged upon the tug.

Judgment may be entered for the libelant for one-half his damages, with costs, with a reference to compute the amount.