DADY v. BACON.

(District Court, S. D. New York. December 8, 1904.)

1. TOWAGE—CONTRACT TO TOW BARGE TO CUBA.

The claim of the owner of a barge that a contract for her towage from New York to Cuba by a steamship required the ship to keep along shore, and take unusual care of the barge in view of her age and condition, *held* not sustained by the evidence.

2. SAME—LOSS OF TOW THROUGH UNSEAWORTHINESS—LIABILITY OF TOWING VESSEL.

The charterer of a steamship *held* liable for half the damages arising from the loss of a barge and cargo while being towed by the steamship from New York on a voyage to Cuba, where the sinking of the barge resulted from her unseaworthy condition for the voyage, due to her age and condition, her low freeboard when loaded, and the fact that she was without a rudder, which caused her to sheer and added to the strain upon her, but where such facts were·known to the master of the steamship when he undertook the service, and he proceeded at his usual speed notwithstanding.

In Admiralty. Suit for loss of tow.

Peter S. Carter, for libellant.
Wheeler, Cortis & Haight, for respondent.

ADAMS, District Judge. This action was brought by Michael J. Dady, as owner of the barge James L. Ogden and her cargo against Daniel Bacon, the charterer of the steamship Vimeira, to recover damages said to amount to $6,000, arising out of the loss of the barge with cargo, while being towed, on a hawser, by the steamship from New York to Cardenas, Cuba, on the 4th day of June, 1902.

The action is brought on a theory of the failure on the part of the respondent to fulfill the obligations of the towing contract, which, it is alleged, required the respondent to tow the vessel along the coast, whereas the steamship was making a direct course from New York to Cape Hatteras, which carried her a considerable distance from the coast, probably about 40 miles at the place in question; also failure upon the respondent's part to tow at reduced speed and take special care of the barge, in view of her age, as he had agreed to do.

The testimony shows that the only writing between the parties was a memorandum, made apparently after the loss of the barge, but doubtless before it was known, as follows:

"New York, June 5, 1902.
Due Daniel Bacon on account of freight per S. S. Vimeira, Seven hundred /$_{00}$ dollars.
If barge lost, proportionate rate according to place lost.
M. J. Dady
per W. Van Tine."

Arrangements were first made for the towing of two barges, for which the compensation was to be $1,250, but it was subsequently found by the libellant, that he only had one ready to go, which resulted in a towing contract to take that one for $700. It is now contended by the libellant that the one was to be taken at half the price of the two and that for the $75 extra, the respondent agreed to tow along the coast and take special care of the barge which contract was violated by the respondent's vessel in going out to sea with the barge, so that when the loss occurred, she was a considerable distance from the coast and the loss was due to such fact and the failure on the steamship's part to take the agreed care.

The making of the alleged special agreement is explicitly denied by the respondent and his agents, who say that the only arrangement was for the payment of $700 for the towage. The respondent and his agents have testified that no agreement whatever was made as to the course of the steamship on the voyage; that when such matter was broached, early in the negotiations, by the libellant's agent, Mr. Van Tine, who alone supports the libellant's claim in this respect, he was told by Mr. Hassler, respondent's agent, who alone was present when the idea was presented, that the barge would not be taken on any such terms.

Mr. Van Tine also claims that a reference was made to the tow-

age of the barge Palmer, belonging to the libellant, by the steamship David and that this towage was to be done in a similar manner. This is also denied by the respondent's agents and it appears that the David was under charter to the libellant for a round trip to Cuba and return at a fixed sum, which entitled him to use her as he pleased. There is no similarity between this case and the Palmer and David and the reference to that case only tends to discredit the libellant's witness.

It is testified that it would have taken the steamer about a week beyond the ordinary voyage to have carried out the contract as contended for by the libellant and her charter hire of $115 per day, with her expenses for coal, make a total cost of the steamship to the respondent of about $175 per day, so that if the contract was as contended for by the libellant, the respondent would have incurred a liability for expenses considerably in excess of the towage returns. The improbability of such a contract being made, in connection with the testimony, satisfies me that the respondent's version of what occurred between the parties should be accepted. I, therefore, conclude that the contract as contended for by the libellant has not been established and the libel in this respect must fail.

This barge was built at Poughkeepsie, New York, in 1864 and intended for service on the North River or interior waters. When she was offered to the Vimeira, she was without a rudder, it having been taken out, as it was thought to be unavailable for sea use, and the consequence of her having no steering apparatus was, that she sheered badly while being towed. For such reason, the pilot of the steamship refused to take her in tow when tendered in New York harbor and she was towed outside to the Sandy Hook Lightship by a tug. On the way down to the lightship, the barge slewed from side to side. She was made fast to the steamship at the lightship with hawsers furnished by the barge running from the steamship's quarters to the barge's towing bitts, about amidships. She then had a part of a cargo on board which put her down in the water somewhat so that her freeboard amidships and aft was only about 2½ to 3 feet. Forward it was 4½ to 5 feet. Signals were arranged whereby those on the barge could indicate to the steamship whether or not she was towing safely.

The steamship started, with her tow, on the 3rd day of June, about 4 o'clock A. M., laying a course for Cape Hatteras. The weather was fine and continued so up to the end. The steamship's usual speed was from 8 to 9 knots. During the day she made about 7 knots. Up to about 8 o'clock P. M., so far as the steamship was advised, nothing unusual occurred on the barge, although she was sheering badly, owing to her lack of rudder, but at that time a signal was displayed to the steamship asking that she proceed slowly. The steamship complied with this request and during the night went at the rate of about 2 knots. There is a conflict between the witnesses from the barge as to her condition at this time, one of the three men on board testifying that there were then 2 feet of water in the hold, and another that the barge was not then leaking seriously. I am inclined to believe the former. There is no dis-

pute between the two witnesses, who have been examined of those on board, that after the signal she leaked badly. During the night, one of her two pumps became choked and useless. By pumping all night with the other, she was kept afloat but when day broke on the morning of the 4th, a sign was displayed on the barge that she would not float more than two or three hours and the men were then taken off by a boat from the steamship. At this time, the tow was opposite a point on the coast about half way between the Delaware and Chesapeake Bays. The master of the steamship so estimated and that they were then about 50 miles from the coast and about 90 miles from Cape Henry. Under the circumstances, he did not feel bound to deviate from his course, especially as the appearance of the barge indicated that it was not probable she would last much longer, though in fact, she did not sink for 8 or 10 hours. If that could have been known at the time, it does not seem that it would have made much difference, as it is doubtful if in view of her position she could have been saved in any event. Her distance from the coast and the nearest port of refuge was such that going at the slow rate of speed she was obliged to use under the circumstances, she was practically without reasonable hope of reaching harbor, after she became partially filled with water.

Apart from the alleged contract, the real question in the case is, was the charterer of the steamship in any way liable for the loss. I have found there was no such contract as the libellant claims, but the question remains, whether under the general principles of towage, i. e., the duty of the towing to the towed vessel, the respondent should be held for the loss, or a part of it.

The master of a boat offering her for towage represents her as sufficiently strong and staunch to withstand the ordinary perils to be encountered on the voyage. If she be unseaworthy by reason of weakness, decay or leaks, and such defects are not obvious to the master of the tug, he will be absolved from responsibility when the unseaworthiness causes the loss. The Edmund L. Levy, 128 Fed. 683, 63 C. C. A. 235.

It appears here, that the barge was unseaworthy in the sense of not being in a fit condition to tow safely in ordinary weather, without special care. She was old and weak, and without a rudder, which added greatly to the strain put upon her by the towing. It is said that she travelled, by reason of her sheering, 9 knots while the steamship was going 7. The respondent himself was not advised of her condition but sufficient has been shown to make it clear that the master of the steamship knew the risk that would be assumed. In the beginning, the pilot, to the master's knowledge, refused to take the barge in tow because of her rudderless condition, which made it obvious to any one familiar with towing, that the venture would be attended with more or less risk. The small freeboard was observed by the master of the steamship, when he saw the barge in the harbor and again when she was made fast at the lightship. He knew the reason for the pilot's refusal to tow the barge out to the steamship. He also knew that the towing hawsers were made fast on the barge to her bitts amidships, so that

she would sheer. He also knew that the barge was not all right when he commenced the towing but started with her upon a signal from her that she was all right, and took her because she was given him to tow. He said that he proceeded at his usual full speed of 8 or 9 knots, except for the tow, which reduced it to about 7, in the face of the fact that he considered one knot too great for the barge. It is not pretended that the respondent gave the master of the steamship any instructions as to the method of towing. No doubt the respondent expected that a suitable vessel for towing would be furnished by the libellant. What the master did, however, was clearly within the scope of his authority as agent of the respondent.

In view of the unseaworthiness of the barge, and the negligence of the respondent's agent in taking her in tow and in not observing proper caution according to her condition, this seems to me to be a case for a division of damages. The Bordentown (D. C.) 16 Fed. 270; The Syracuse (D. C.) 18 Fed. 828; Pettie v. Boston Tow Boat Co., 49 Fed. 464, 466, 1 C. C. A. 314.

Decree for libellant for half damages, with an order of reference.