THE MAUI.

KING v. DELAWARE, L. & W. R. CO.

THE DALZELLANCE.
No. A—17477.

District Court, E. D. New York.
March 18, 1947.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for libelant.

John E. Morrissey, of New York City, for respondent Delaware, L. & W. R. Co.

J. Vincent Keogh, U. S. Atty., of New York City (Vincent A. Catoggio, Sp. Asst. to U. S. Atty., and Gilbert S. Fleischer, both of New York City, of counsel), for respondent the Dalzellance.

BYERS, District Judge.

The scow Maui was damaged on Sunday afternoon, September 10, 1944, by striking her stern at the starboard corner against the S. S. Jerco Topic lying on the north side of the 30th Street pier in Brooklyn, while the scow was being shifted across the slip, from alongside the ship; the tug Dalzellance did the shifting.

The damage consisted in the complete carrying away of the upper and lower stern bumper logs and some adjacent timbers, and is said to have resulted from the force of the striking, and the rubbing along the side of the ship for some distance, and the apparent catching of the stern starboard corner of the scow on some protuberance on the side of the ship.

There is no question that the incident occurred, and the dispute is mainly directed to the defense that the scow was so old and decrepit that she could not withstand what is urged to have been an ordinary harbor contact, and was therefore unseaworthy.

The legal situation was this: The libelant had chartered the scow to the respondent Railroad Company in June of 1944, and following the 16th day of that month she was continuously in service under the charter, until the day in question, i. e., she was not too frail for carrying sundry cargoes during that period of time.

On September 9th the scow, being laden with 306 tons of steel, was made fast alongside the ship, at the latter's port side about midships, to discharge the cargo, and that task was completed around 10.00 A. M. of the following day.

A D. L. & W. tug, the Stroudsberg, with a barge and scow in tow, arrived at the scene at about 3:00 P.M. under orders to take the Maui to Hoboken, but found the tug Dalzellance in the act of shifting her away from the ship, which was about to clear.

That engagement was directed by the master of the tug, Fred B. Dalzell, who was on the ship, since the undocking was being performed by Dalzell tugs.

The libel names both the Railroad Company and the tug Dalzellance, and two causes are pleaded:

The first alleges the charter of the scow to the Railroad Company, i. e., a demise, delivery in good condition, and return in damaged condition not due to ordinary wear and tear, etc.

The second is against the Railroad Company and the tug Dalzellance, and alleges that, while the scow was under the supervision and control of the former, the tug took the scow "in tow in order to remove it" (as above stated), and "the tug was so carelessly and negligently navigated and controlled that it brought the scow into collision with the ship causing considerable damage * * *". The specifications of fault are conventional, i. e., incompetence, failure to maintain lookout, bringing the scow into collision, and doing nothing to avoid collision. Thus the libelant undertook to prove facts which would absolve the charterer of negligence.

Process was asked against the tug, etc., and that the Railroad Company be cited to answer, etc.

Since the evidence is clear that the damage was caused by the tug, no reason is seen to order a decree against the Railroad Company, even secondarily. It has gone forward with proof either on its own behalf or in support of the second cause pleaded by libelant, which is sufficient to rebut the presumptive case arising from the failure to return the scow in good order, etc., namely, it has presented the testimony of its employees aboard the Stroudsberg as to the observable incidents of the maneuver, and has thereby exonerated itself, since the shifting of the Maui was not done by it or at its direction; there is no reason to suppose that if the Stroudsberg had been permitted to take the Maui in tow, from alongside the ship as she was intending to do, the purpose would not have been accomplished without damage to the scow.

The cases cited by libelant to establish secondary liability upon the charterer have been examined and are thought to justify the conclusion above stated. See particularly the discussion in the case of O'Donnell Transportation Co. v. M. & J. Tracy, Inc., 2 Cir., 150 F. 2d 735, at page 737, where it is stated that the charterer "had the burden of going forward with evidence to explain the accident". This the Railroad Company has done, and since it did not entrust the Maui to the Dalzellance, but was prevented by her from performing its own duties as bailee of the scow, it seems clear that the burden has been sustained.

The scowman Parachini had left the Maui in good condition on this Sunday afternoon at about 2:15 P.M. and since he was part of that which was the subject of the charter, Dailey et al. v. Carroll et al., 2 Cir., 248 F. 466 (approved in many later cases, and as recently as Smith Scow Corporation v. Seaboard Great Lakes Corporation, 2 Cir., 146 F.2d 535), if that was to be criticised, as between the owner and the charterer, the latter is not at fault.

However, it does not seem that under these circumstances it constituted a fault, if the exposition of the subject in United States v. Carroll Towing Co., Inc., 2 Cir., 159 F.2d 169, is presently understood. This is not a case in which the scow's fasts carried away, nor does it appear that Parachini's absence amounted to a passive breach of duty, or rendered the collision inevitable.

The tug's captain was in the galley and therefore not in command; he testified, however, that in his opinion the tug could have maneuvered from between the scow and the ship, if the scowman had been available to handle his lines. That does not excuse the tug for not backing far enough to enable the scow to begin her turn when she was in clear water astern of the ship, assuming that indeed Brennan could not have handled all lines in the preferred movement, as he did in the one which was in fact conducted, which seems argumentative at best.

The responsibility assumed by the Dalzellance was to shift the scow in a seamanlike manner, that is, to bring to bear the skill of the calling so enlisted. Her own version of the maneuver is accepted for present purposes:

Gunderson, the tug's pilot, was in charge, being on watch; he put out a bow line, a tow line from his side bitt to the middle bitt on the scow, and a stern line; these were made fast by the deckhand Brennan, who was put aboard the scow to do this and let go the bow and stern lines of the scow to the ship, as ordered. Then the tug backed and the scow's bow line was let go, which caused the bow of the scow to swing across the slip; then her stern line was let go, and the tug came ahead. In that movement, the stern of the scow struck the side of the ship with force, and scraped along the ship's side, and then was landed on the opposite side of the slip, in the second berth alongside another scow.

While the Maui was moving across the slip, her two bumper logs carried away and dropped off before she reached her new berth.

Gunderson said that, as he approached the Maui, "I noticed she was an old 'rotten scow, but I did not notice anything wrong with it".

Brennan said the lines were put out as stated and "I observed that her condition was poor from what we could see".

They both saw the Maui's bumper logs in the waters of the slip, after they had come away.

■ Ambrose, captain of the tug, was in the galley at the time, and says he was not aware of any jar at the time the scow struck the ship. That the tug could have nosed her way in between the Maui and the ship, coming in astern of the scow, and thus have maneuvered the turn from the starboard side of the scow, but for the absence of one deckhand on the tug, and a man on the scow to handle lines. Had the tug so contrived the movement, it is easy to see that the stern of the scow need not have been brought into contact with the side of the ship, and since Gunderson observed the Maui to be as he described her, it seems to follow that the election to perform the maneuver as it was conducted, instead of in the better way which Ambrose described, must visit upon the tug the natural and probable consequences of the choice, namely, the damage in question. If Gunderson realized, as he said that he did, that the scow was old and 'rotten, it amounted to negligence to attempt to maneuver her around and across the slip in a manner which perhaps would have been appropriate in the case of a sturdy craft which could have been expected to withstand the kind of contact which was bound to be involved in pivoting her against the side of the ship. Nor does it appear why he could not have towed the scow entirely clear of the ship's stern, if he preferred to conduct a backward movement, before making the turn at all. It is a fair inference that this was a job done in a hurry with scant regard for the safety of the scow.

■ It remains to consider, however, whether it is a just result to visit the entire damage upon the tug.

A survey was held on September 14th at the Swenson Yard, which was attended by Messrs. Bagger, Haight, McConnell and McCarthy, none of whom signed; Bagger and Haight represented Dalzell, and so refused because they considered the loss of the bumper logs to be attributable to the rotten condition of the knees that were supposed to support them, lack of fastenings, etc., broken and damaged corner irons, etc.; why they could not have signed without prejudice, however, is not understood. The other surveyors followed their example.

The evidence is quite convincing that, while these bumper logs had been replaced in 1939, and were probably sound enough as timbers, the same cannot be said for the members which were supposed to support them and to furnish holding power. Some of these were absent and the few survivors were so worn, frail and insufficient, that the two bumper logs and their adjacent timbers were caused to carry away. That would not have happened but for the infirm and inadequate construction enumerated in the testimony of Bagger and Haight.

Making all allowance for the temptation to keep in service during the stress of the war years all floating equipment which would not suffer an outright collapse under ordinary usage, the fact remains that, when such a result as is here shown is brought to pass by no greater fault than can be fairly attributed to the tug, it is not fair or just to say that the owner did not contribute to the damage by failing to maintain his scow as her age and structural infirmities required.

The libelant's answers to the tug's interrogatories have not been overlooked, nor has the testimony of Warowicz been ignored.

It should be said that the greatly impaired condition of the knees and the absence of other holding elements were not discoverable upon ordinary inspection, but required opening up such as removal of the stern planking or of the bumpers themselves, and the scow would have had to be placed in drydock to effect the necessary replacements. None the less this owner, who seems to have operated his own repair yard, must be held to have exposed his scow to damage from such a maneuver as this, by failing to

maintain her in a "tight, staunch and strong" condition. She was said by her owner's surveyor, Mr. Chas. W. Aldrich, to be in as good working condition as 70 to 80 per cent. of these boats working in the harbor at the time, and probably that is true, but I am satisfied that within The Bordentown, D.C., 16 F. 270; The Young America, D.C., 54 F. 410; DeLella v. The Atalanta, D.C., 34 F. 918; and Walaas v. Johnson et al., 5 Cir., 204 F. 440, this is a half damage case, and the usual interlocutory decree to that effect, with costs to the libelant, may be settled on notice. Findings and Conclusion are filed herewith.